# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

JAMES G. PERDIGAO

VERSUS

ADAMS AND REESE, L.L.P.,                         CIVIL ACTION NO. 08-3570
CHARLES P. ADAMS, JR.,
B. JEFFREY BROOKS,                                        SECTION:  L
EDWIN C. LAIZER,
PAUL J. LASSALLE,                              JUDGE ELDON E. FALLON
THOMAS G. O'BRIEN,
MARK J. SPANSEL,                                   MAGISTRATE:  5
MARTIN A. STERN, AND
ROBERT A. VOSBEIN

## PLAINTIFF'S MEMORANDUM IN OPPOSITION
## TO DEFENDANTS' MOTION TO DISMISS
_____

In the memorandum in support of its motion to dismiss, the defendants spin a tale about "an increasingly desperate man" who files "sensational, false allegations" which are no more than a "fantasy" intended "to poison the jury pool with publicity."  And, according to Adams and Reese and the other defendants, this man, the plaintiff, James Perdigao, must be silenced for the sake of "the integrity of the judicial system."

It is surely a most doubtful story which insists that an individual man's supposed desperation puts the integrity of the entire judicial system at risk. After all, integrity

1

depends first and foremost on truth, not - as Adams and Reese and the other defendants insist - on loyalty.

It may well be that the defendants wish that what it refers to as "loyalty" were the actual keystone to the entire legal structure. After all, that "loyalty" would then provide insuperable cover for the nefarious and unlawful practices outlined in the Complaint, and the practice of law would be the one assured haven for racketeering.

What the defendants mischaracterize as desperation is, in fact, resolution, the determination that truth be exposed, and the only sort of system that will not or cannot accommodate truth is a system made an ever greater fraud any time it insists, in effect, that integrity can persist divorced from truth.

Fortunately for the integrity of the legal system and the populace it is supposed to serve, the rules and law which constitute the legal system much more frequently subvert loyalty to truth than the defendants would lead the Court to believe. This fact about the law will be more fully set forth below, and it will be clear and obvious that relatively recent adjustments to the rules regarding client confidentiality are intended to make truth that much more an attainable goal, even at the expense of what the defendants try to portray as loyalty.

### Introduction

In their motion to dismiss, defendants assert three basic arguments for dismissal of the complaint.  First, the defendants argue that the complaint should be dismissed because the plaintiff breached his duty of client confidentiality.  However, as explained

below, plaintiff is permitted to reveal client information under the crime/fraud exceptions to Rule 1.6.

Furthermore, as will also be explained below in more detail, a lawyer is free to disclose confidential information when a client makes a claim against the lawyer, whether the lawyer is accused falsely or not, in a legal proceeding or not. When a client makes an accusation against a lawyer, the client's previously confidential information is allowed to be used by the lawyer in defensive response to the claims levied against him or her.

And, what the defendants failed to advise the court about is that many if not most of the clients referenced in the complaint - including Robert Guidry (and his affiliated companies), Harrah's Entertainment (and its affiliated companies), Pinnacle Entertainment (and its affiliated companies), Boomtown Casino (and its affiliated companies), Casino Magic (and its affiliated companies), Allstate Insurance (and its affiliated companies), among others - have asserted claims against the plaintiff as well as against the firm relating to the funds currently held in the registry of the court.

In order to strengthen its claim against the monies held in the registry of the court, and – in some if not most of the cases - in order to increase the likelihood of retaining those clients, the firm has taken an assignment of the clients' claims on the monies held in the registry of the court as part of settlements reached with those clients on their claims against the firm and the plaintiff without consent of the plaintiff.

As such, the firm stands in the shoes of the clients as it relates to those claims, and the clients' assertions against the plaintiff still stand.  Pursuant to an express exception to

the Louisiana Rules of Professional Conduct (see Rule 1.6(b)(5)), plaintiff is permitted to reveal information relating to the representation of the client to establish a claim or defense to the firm's/client's claims.

Second, the defendants argue that the complaint fails to state a claim under RICO for lack of causation and pattern. Defendants misleadingly seek to re-cast plaintiff's complaint as that of nothing but a whistleblower, despite the fact that six of the eight racketeering schemes set forth in the complaint (which cover a period of more than three years) occur after the plaintiff resigned from the firm. In doing so, however, the defendants overlook the express recitation of the predicate acts set forth at the beginning of each scheme. As more fully shown below, the complaint describes the defendants' conduct as violations of the following laws, among others: 18 U.S.C. 201 (relating to bribery); 18 U.S.C. 1341 (relating to mail fraud); 18 U.S.C. 1343 (relating to wire fraud); 18 U.S.C. 1503 (relating to obstruction of justice); 18 U.S.C. 1510 (relating to obstruction of criminal investigations); 18 U.S.C. 1512 (relating to tampering with a witness, victim or an informant); 18 U.S.C. 1513 (relating to retaliating against a witness, victim or an informant); 18 U.S.C. 1951 (relating to interference with commerce, robbery or extortion); and 18 U.S.C. 1952 (relating to interstate travel in aid of racketeering). See Complaint, ¶ 4. As more fully set forth below, these predicate acts establish the requisite causation and pattern for plaintiff's RICO claims, and therefore, the defendants' 12(b)(6) motion fails.

Third, defendants assert that the affirmative defense of *in pari delicto* requires dismissal. As explained below, a private action for damages may be barred on the

4

grounds of the plaintiff's own culpability only where as a direct result of his own actions, the plaintiff bears at least substantially equal responsibility for the violations he seeks to redress. No fair or tenable reading of the complaint would have plaintiff bearing equal – or anything even approaching substantially equal - responsibility for the unlawful and unethical conduct by his partners set forth in the complaint about which plaintiff objected and reported to authorities.

### Standard for Motion to Dismiss

A motion to dismiss an action for failure to state a claim "admits the facts alleged in the complaint, but challenges plaintiff's right to relief based upon those facts." *Ward v. Hudnell*, 366 F.2d 247, 249 (5th Cir. 1966); *Nolen v. Nucentrix Broadband Networks, Inc.*, 293 F.3d 926, 928 (5th Cir. 2002); see also, *Rubinstein v. Collins*, 20 F.3d 160, 166 (5th Cir. 1994). Dismissal cannot be upheld unless it appears beyond doubt that the plaintiffs would not be entitled to recover under any set of facts that they could prove in support of their claim. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Worsham v. Pasadena*, 881 F. 2d 1336, 1339 (5th Cir. 1989).

Defendants jump the gun by filing their motion to dismiss without waiting for plaintiff's RICO Case Statement. If the defendants had waited, perhaps they may not have misunderstood the extent of the racketeering activity pled by the plaintiff. Plaintiff's RICO Case Statement is currently due to be filed on July 9, 2008. This Case Statement will set forth, with additional details and specificity, each of the predicate acts listed in the complaint.

All RICO violations under 18 U.S.C. 1962 entail "(1) a *person* who engages in (2) a *pattern of racketeering activity*, (3) connected to the acquisition, establishment, conduct or control of an *enterprise*." *Crowe v. Henry*, 43 F.3d 198, 204 (5th Cir. 1995) citing *Delta Truck and Tractor, Inc. v. J.I. Case Co.*, 855 F.2d 241, 242 (5th Cir. 1988). In order to establish standing under 18 U.S.C. 1964(c), a plaintiff must show (1) a violation of §1962, (2) an injury to his business or property, and (3) that his injury was directly caused by a RICO violation. *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 228 (1992). When the complaint is read together with the Case Statement, it is clear that plaintiff has properly pled all of the elements of a RICO claim and has stated a claim based upon the facts alleged in the complaint.

### Plaintiff's Allegations

Plaintiff alleges that the "enterprise" within the meaning of 18 U.S.C. 1961(4) is Adams and Reese, LLP. Count I of the complaint alleges a cause of action against defendants Adams, Brooks, Laizer, Lassalle, O'Brien, Spansel, Stern, and Vosbein (collectively, the "RICO Defendants") under 18 U.S.C. 1962(c). Section 1962(c) provides that:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct such enterprise's affairs through a pattern of racketeering activity or collection of an unlawful debt.

18 U.S.C. 1962(c). Accordingly, plaintiff alleges that the RICO defendants conducted and/or participated in the conduct of the affairs of the firm through a pattern of racketeering activity.

Count II of the complaint alleges a cause of action against the RICO Defendants under 18 U.S.C. 1962(d). Section 1962(d) provides that:

> It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

18 U.S.C. 1962(d). Accordingly, plaintiff also alleges that the RICO Defendants conspired to violate 18 U.S.C. 1962(c), in violation of 18 U.S.C. 1962(d).

Plaintiff's complaint sets forth eight separate schemes, each involving multiple predicate acts and none of which cite retaliatory discharge. As noted above, most of the predicate acts alleged in the complaint occur in the more than three-year period following plaintiff's resignation from the firm. Because defendants mischaracterize plaintiff's injury as a retaliatory discharge plus a few sporadic incidents of supposed retaliation, plaintiff is compelled to properly characterize the predicate acts associated with each scheme.

The first scheme describes an obstruction of justice scheme by the defendants involving the Morial subpoena. The complaint describes predicate acts involved in this scheme to include, inter alia, violations of 18 U.S.C. 1503 (relating to obstruction of justice), 18 U.S.C. 1510 (relating to obstruction of criminal investigations), and 18 U.S.C. 1512 (relating to tampering with a witness, victim or an informant). See Complaint, ¶¶ 112-118. Factual allegations supporting these predicate acts include, inter alia, non-production of documents responsive to a federal grand jury subpoena (Complaint ¶ 113, 114), alteration of responsive documents (Complaint ¶ 115), and bribery and intimidation (Complaint ¶ 116). Other predicate acts in this scheme, as will be further detailed in

plaintiff's RICO Case Statement, also include violations of the Travel Act, 18 U.S.C. 1952, and other federal law violations described in 18 U.S.C. 1961.

The second scheme describes an unlawful effort to drive plaintiff out of the partnership and to relinquish his partnership interest. The predicate acts involved in this scheme include, inter alia, violations of 18 U.S.C. 1503, 18 U.S.C. 1510, 18 U.S.C. 1512, 18 U.S.C. 1951, and 18 U.S.C. 1952. See Complaint, ¶¶ 119-131. Factual allegations supporting these predicate acts include, inter alia, deliberate misleading of federal prosecutors in connection with a federal grand jury subpoena (Complaint ¶ 127) and extortion threats and intimidation (Complaint ¶ 128-131).

The third scheme (which is the first of six schemes to occur after plaintiff's resignation from the firm) describes an unlawful scheme to omit material facts in reports to federal authorities and disciplinary counsel. The predicate acts involved in this scheme include, inter alia, violations of 18 U.S.C. 1341, 18 U.S.C. 1343, 18 U.S.C. 1503, 18 U.S.C. 1512, and 18 U.S.C. 1952. See Complaint, ¶¶132-134. In this scheme, plaintiff alleges that certain of the defendants orchestrated a mail and wire fraud scheme to conceal the obstruction of justice conspiracy and to impeach plaintiff's credibility should he assist the government in the Morial subpoena matter. The firm made fraudulent reports to the federal authorities and to disciplinary counsel accusing plaintiff of engaging in prohibited entrepreneurial activities and of various billing irregularities, even though firm management was aware of and had approved of plaintiff's entrepreneurial activities and billing practices. Complaint, ¶132. These reports were part of a fraudulent scheme in that, inter alia, they made no reference to their true motive- to protect and preserve the

obstruction/fraud schemes to which the plaintiff objected. Indeed the reports failed to mention the real reasons the firm was taking action against the plaintiff- namely, to silence him, to destroy his credibility in the Morial subpoena matter and other matters, and to deny him access to information and documents regarding the unlawful activities. Through these reports, the defendants engineered a systematic program of character assassination, which led to his arrest, interim suspension from the practice of law, and false portrayal in the public eye. Through these schemes, plaintiff was injured in his business and property. Complaint, ¶134.

The fourth scheme describes a scheme to further injure plaintiff's business and property through the omission of material facts in media campaigns and letters to plaintiff's clients. The predicate acts involved in this scheme include, inter alia, violations of 18 U.S.C. 1341, 18 U.S.C. 1343, and 18 U.S.C. 1952. See Complaint, ¶¶ 135-138. Plaintiff alleges that in an effort to further injure plaintiff's business reputation and right to earn a living, Adams, Laizer, Lassalle, O'Brien, Spansel and Stern conspired and agreed to hire a public relations firm to implement a media strategy that included significant misrepresentations of fact. This media strategy resulted in a number of press releases and media statements which were false and fraudulent in the same manner as were the reports to the authorities outlined above. (Complaint ¶ 136). In addition, Adams, Laizer, Lassalle, O'Brien, Spansel and Stern conspired and agreed to send letters to plaintiff's clients that included significant misrepresentations of fact. Like the media reports, these letters omitted material information and were false and fraudulent in the same manner as were the reports to the authorities outlined above. These letters were

also intended to injure plaintiff's business reputation and right to earn wages.  These media campaigns and letters to clients were a proximate cause of the injury to plaintiff's business and property.  Although plaintiff did not rely on the fraudulent statements, reliance on the misrepresentations was unnecessary because plaintiff was the target of the fraudulent scheme.  (Complaint ¶ 137-138).

The fifth scheme describes an unlawful effort to deprive plaintiff of his COBRA rights and other insurance benefits.  The predicate acts involved in this scheme include, inter alia, violations of 18 U.S.C. 1341, 18 U.S.C. 1343, 18 U.S.C. 1503, 18 U.S.C. 1512, and 18 U.S.C. 1952.  See Complaint, ¶¶ 139-142.  As a result of the plaintiff's cooperation, defendants Adams, Laizer, O'Brien, Spansel, Stern, and others conspired to injure and intimidate plaintiff on account of his exercise of his right to inform federal officials of their violations of federal law.  They did so by unlawfully terminating plaintiff's federal COBRA rights and improperly interfering with other insurance rights belonging to the plaintiff. (Complaint ¶ 140).  Plaintiff had timely made the requisite COBRA election and promptly paid the requisite insurance premiums, but defendants Adams, Laizer, O'Brien, Spansel and Stern unlawfully decided to terminate plaintiff's COBRA election, even though no valid legal basis existed for them to do so and despite the fact that plaintiff, and not the firm, had the responsibility for paying all of the premiums.  (Complaint ¶ 141).  The unlawful termination of COBRA coverage caused pre-existing condition coverage issues for the plaintiff.  In addition, because plaintiff was unable to obtain insurance coverage equivalent to the firm's large group policy, he was forced to purchase more expensive insurance with less coverage, thereby injuring him in

his business and property.[1]    Part of this unlawful scheme to deprive plaintiff of his COBRA rights and other insurance benefits included correspondences and communications to third party administrators and insurers which omitted material facts and contained material, intentional misrepresentations of fact concerning plaintiff. (Complaint ¶142).  The time, place and content of the false misrepresentations will be set forth with particularity in plaintiff's RICO Case Statement.

The sixth scheme describes an unlawful scheme to deprive the plaintiff of his capital account.  The predicate acts involved in this scheme include, inter alia, violations of 18 U.S.C. 1341, 18 U.S.C. 1343, and 18 U.S.C. 1952.  See Complaint, ¶¶ 143-144. Factual allegations supporting these predicate acts include, inter alia, the fact that plaintiff's K-1, as filed with the IRS, reflected that the balance of plaintiff's capital account was distributed to the plaintiff.  However, as plaintiff's cooperation continued through 2005 and into 2006, and since the defendants were aware that plaintiff's cooperation focused on their illegal activities, the defendants fraudulently schemed and decided not to distribute the proceeds of plaintiff's capital account to plaintiff, and they used the U.S. mails, wires, and instrumentalities of interstate commerce to advance, conceal and further this fraud scheme. (Complaint ¶ 143-144).

The seventh scheme describes an unlawful scheme to obtain confidential information regarding plaintiff's cooperation and to unlawfully influence that cooperation.  The predicate acts involved in this scheme include, inter alia, violations of

---

[1] Of course, plaintiff would not have made the COBRA election had he been able to acquire equivalent health insurance at a lesser cost.  However, to the extent that the court believes that the plaintiff's complaint is not sufficiently clear regarding plaintiff's damages on this point, plaintiff will request leave to amend to allege that he was damaged by having to purchase more expensive insurance with less coverage.

18 U.S.C. 201, 18 U.S.C. 1503, 18 U.S.C. 1512, 18 U.S.C. 1513, and 18 U.S.C. 1952. See Complaint, ¶¶ 145-150. Factual allegations supporting these predicate acts include a series of leaks of information concerning his confidential cooperation with the federal authorities. (Complaint ¶146). In addition, the complaint includes factual allegations relating to bribery (Complaint ¶147), threats and intimidation (Complaint ¶147-148), attempted murder (Complaint ¶ 149), and obstruction of justice (Complaint ¶150).

The eighth scheme describes an unlawful scheme to obstruct the criminal investigations of Marc Morial and Robert Wooley. The predicate acts involved in this scheme include, inter alia, violations of 18 U.S.C. 1341, 18 U.S.C. 1343, 18 U.S.C. 1503, 18 U.S.C. 1512, and 18 U.S.C. 1952. See Complaint, ¶¶ 151-153. Factual allegations supporting these predicate acts include a series of obstructions of justice relating to non-production of documents responsive to federal grand jury subpoenas and concealing of responsive documents (Complaint ¶152-153).

The injuries to plaintiff's business and property include, inter alia, interference with his right to practice law and earn a living, false reporting, false arrest and false imprisonment resulting in interference with his right to conduct business, interference with his property rights in his partnership interest, interference with his relationships with his current and prospective clients, damage to his business reputation, unlawful withholding of his capital account, increased insurance costs, and damage to his property interests during the shooting incident.

**Argument**

**I. The Louisiana Rules of Professional Conduct permit plaintiff to disclose client information under these circumstances.**

*A.  Introduction.*

Except under specified circumstances, an attorney may not divulge his client's confidences.  See *U.S. v. Cavin*, 39 F.3d 1299, 1308 (5th Cir. 1994); *Abell v. Potomac Ins. Co.*, 858 F.2d 1104, 1124 (5th Cir. 1988) (noting that disclosing material facts to third persons may breach duty of confidentiality), *vacated on other grounds sub nom. Fryar v. Abell*, 492 U.S. 914 (1989).  The duty of confidentiality is, however, subject to several major exceptions.  Sometimes attorneys become embroiled in disputes concerning their performance as agents.  Obvious examples include fee disputes and malpractice suits.  Other examples involve claims asserted by the government or third parties alleging that attorneys knowingly participated in, or failed to disclose, client wrongdoing.  The Louisiana Rules of Professional Conduct create broad crime/fraud exceptions as well as a "self-defense" exception to the general confidentiality obligations.

A lawyer is perfectly free to disclose confidential information when he or she is the one accused, falsely or not, in a legal filing or not, and the accusation is not even required to necessarily have been publicly made.  There is not even any requirement that the lawyer's liberty be at stake, or even that the lawyer be accused of anything criminal.  A simple fee dispute with a client can be sufficient grounds to disclose confidential information.

Courts interpreting the attorney-client privilege (the evidentiary rule corollary to the ethical duty of confidentiality) have also given attorneys broad discretion to disclose confidential information without client consent under the self-defense exception.  In one well-known early case, for example, a court held that an attorney seeking to collect a fee

could introduce letters written to him by the defendant, his former client, revealing that the defendant "was engaged in leasing buildings for immoral purposes." *Stern v. Daniel*, 47 Wash 96, 91 P 552, 553 (Wash. 1907).

Lawyers may invoke the self-defense exception in suits brought by third parties. In *Meyerhofer v. Empire Fire and Marine Insurance Co.*, 497 F.2d 1190, 1194-95 (2d Cir. 1974), *cert. denied*, 419 U.S. 998 (1974), the court held that disclosure by an attorney defendant of confidential client information to plaintiffs' counsel was proper in a class action securities fraud suit. Upon receiving the information from the attorney, plaintiffs amended their complaint to include more specific facts and removed the attorney as a defendant. The remaining defendants, including the attorney's client, objected, arguing that the disclosure violated the attorney-client privilege and the ethical duties of confidentiality. The Second Circuit rejected this argument and upheld the attorney's right to disclose under the self-defense exception:

> The charge, of knowing participation in the filing of a false and misleading registration statement, was a serious one . . . The cost in money of simply defending such an action might be very substantial. The damage to [the attorney's] professional reputation which might be occasioned by the mere pendency of such a charge was an even greater cause for concern. Under these circumstances [the attorney] had the right to make appropriate disclosures with respect to his role in the public offering.

*Id.* at 1195.

Subsequent cases have extended Meyerhofer, holding that attorneys can disclose even before being actually named as defendants to avoid the "stigma" of being formally charged. See, for example, *In Re Friend*, 411 F. Supp. 776, 777 (S.D.N.Y. 1975) (allowing an attorney to turn over documents to a grand jury investigating him and his

client). Accordingly, it is evidently clear from precedent that an attorney need not even stand accused in a legal proceeding before that lawyer can divulge what had been confidential client information.

The assertion of ethical barriers to plaintiff's attempt to vindicate his personal claims creates a potential conflict with another fundamental policy: the availability of a legal forum for the adjudication of rights.

The Supreme Court has recognized that, in some circumstances, access to courts is protected by the due process clause. *Boddie v. Connecticut*, 401 U.S. 371 (1971). While the Boddie principle does not give any broad "right" of access to federal court, the courtroom door should not tightly be barred to a person who has a tenable legal claim. See *Bill Johnson's Restaurants, Inc. v. N.L.R.B.*, 461 U.S. 731 (1983) (the right of access to the courts may, in some circumstances, be protected by the first amendment right to petition the government for redress of grievances); see also, *Ryland v. Shapiro*, 708 F.2d 967, 971-72 (5th Cir. 1983). It would be a manifest injustice to allow a client to take advantage of the duty of confidentiality to the prejudice of his attorney, or that it should be carried to the extent of depriving the attorney of the means of obtaining or defending his own rights. See, *Meyerhofer*, 497 F.2d at 1194-95 (2d Cir. 1974); see also, *Tasby v. U.S.*, 504 F2d 332, 336 (8th Cir. 1974), *cert. denied*, 419 U.S. 1125 (1975); *Laughner v. U.S.*, 373 F.2d 326, 327 n.1 (5th Cir. 1967).

Again, this makes clear that disclosure of client confidential information is not limited to instances or cases where the lawyer has been charged or sued. Not only is a client not allowed to deny the lawyer "the means of ... defending his own rights" by

invoking client confidentiality, in addition, client confidentiality cannot be used to deny the lawyer "the means of obtaining ... his ... rights." This Complaint is the means by which the plaintiff can obtain his rights, and it is also worth noting that under the facts alleged by the plaintiff, there is no social interest in allowing clients to conceal wrongdoing. Nor is there any social interest in allowing the clients to deny plaintiff the opportunity to prosecute his rights.

   B.  *Disclosure is permitted pursuant to Rule 1.6(b)(2) to prevent client crimes or frauds causing financial injury.*

   Louisiana Rule of Professional Conduct 1.6(b)(2) provides that a lawyer may reveal information relating to the representation of a client to the extent the lawyer reasonably believes necessary "to prevent the client from committing a crime or fraud that is reasonably certain to result in substantial injury to the financial interests or property of another and in furtherance of which the client has used or is using the lawyer's services." This exception to the duty of confidentiality was approved by the Louisiana Supreme Court in January 2004. It permits disclosure of confidential information, in some instances, in order to prevent financial injury caused by criminal or fraudulent acts of the client. In approving this exception, the Louisiana Supreme Court followed the lead of the American Bar Association, which adopted the same rule change by the ABA House of Delegates in August 2003. Proponents of the changes to Model Rule 1.6 which included this exception argued that the change would encourage lawyers to report criminal or fraudulent conduct of their clients. See, *ABA Amends Ethics Rules on Confidentiality, Corporate Clients, to Allow More Disclosures*, 19 ABA/BNA Lawyer's Manual on Professional Conduct 467 (August 13, 2003).

16

The client's abuse of the attorney-client relationship, by using the lawyer's services to further the crimes or the frauds, justifies the exception to confidentiality.  In addition, this exception allows a lawyer who later learns that his services had been used for such a purpose to make disclosures to prevent the client's crime or fraud.  In this instance, this exception applies to those continuing frauds outlined in the complaint to which plaintiff gave ethics advice which was mutated to fit the client's and the RICO defendants' fraud schemes.  For example, plaintiff provided ethics advice as to how the firm could permissibly hire former politicians without running afoul of the two-year prohibition. While outwardly appearing to comply with the ethical restrictions, the RICO defendants circumvented the restrictions through a series of fraud schemes which were hidden from the plaintiff and other partners.  Once plaintiff discovered these fraud schemes, he promptly reported such activities to the authorities, regardless of the circumstances under which that reporting took place.  In the absence of affirmative action by the authorities, plaintiff has an ethical duty – and even a right - to seek to prevent continuing frauds through this action.

C. *Disclosure is permitted pursuant to Rule 1.6(b)(3) to prevent, mitigate, or rectify substantial injury to the financial interests or property of another.*

The confidentiality exception set forth in Rule 1.6(b)(3) is also relatively new and was likewise adopted by the Louisiana Supreme Court in January 2004, following the ABA's adoption of the Model Rule 1.6(b)(3), along with Rule 1.6(b)(2).  Under this exception, the focus is on the disclosures to prevent harm from a previously-committed criminal or fraudulent act by the client.  In particular, the exception permits disclosure "to prevent, mitigate, or rectify substantial injury to the financial interests or property of

another that is reasonably certain to result or has resulted from the client's commission of a crime or fraud in furtherance of which the client has used the lawyer's services." Plaintiff relies on this exception to alleviate the extent of the harms caused by the fraud schemes outlined in the complaint in which the clients had involvement and in which the plaintiff's ethics advice was misused as a smokescreen for the criminal or fraudulent conduct.

D. *Disclosure is permitted pursuant to Rule 1.6(b)(5) to establish a claim or defense on behalf of the plaintiff.*

Louisiana Rule of Professional Conduct 1.6(b)(5) provides that a lawyer may reveal information relating to the representation of a client to the extent the lawyer reasonably believes necessary "to establish a claim or defense on behalf of the lawyer in a controversy between the lawyer and the client, to establish a defense to a criminal charge or civil claim against the lawyer based upon conduct in which the client was involved, or to respond to allegations in any proceeding concerning the lawyer's representation of the client." This exception has been included in the Rules of Professional Conduct since their inception. It permits disclosure in the context of criminal, civil or other proceedings, including disciplinary proceedings. The claims made by the clients against the plaintiff, in particular those which have since been assigned to the defendants, fall under "allegations in any proceeding concerning the lawyer's representation of the client." Therefore, plaintiff is permitted to reveal previously confidential client information in defense of those claims leveled against plaintiff.

This exception to the duty of confidentiality also permits the lawyer to make disclosure in support of claims made by the lawyer in a controversy between the lawyer

and the client.  As noted above, defendants failed to advise the court that many if not most of the clients referenced in the complaint - including Robert Guidry (and his affiliated companies), Harrah's Entertainment (and its affiliated companies), Pinnacle Entertainment (and its affiliated companies), Boomtown Casino (and its affiliated companies), Casino Magic (and its affiliated companies), Allstate Insurance (and its affiliated companies), among others - have asserted claims against the firm and plaintiff relating to the funds currently held in the registry of the court.  In most cases, the firm, in order to strengthen its claim against the monies held in the registry of the court, has taken an assignment of the clients' claims.  As such, because the clients asserted claims and then assigned those claims to the firm, the firm stands in the shoes of the clients as it relates to those claims.  This action can therefore be considered a controversy between the plaintiff and his clients.  Pursuant to an express exception to the Louisiana Rules of Professional Conduct (see Rule 1.6(b)(5)), plaintiff is permitted to reveal information relating to the representation of the client to establish claims or defenses to the firm/client.

   *E. The Ethics Rules permit plaintiff's claims to proceed.*

   Defendants argue that the court should dismiss this action on the basis that plaintiff's action would improperly implicate client confidential information.  Defendants seek to bolster this contention by citing an Illinois Supreme Court case and a few intermediate appellate and district court cases that prohibit retaliatory discharge suits by in house-counsel against former employers.   While this action does not involve a retaliatory discharge claim or an in-house counsel/employer relationship, it is true that a

few Illinois cases and cases from some other jurisdictions take a restrictive view of a former in-house counsel's ability to file suit for retaliatory discharge. The defendants cite only the most restrictive case they could find in *Balla v. Gambro, Inc.*, 584 N.E.2d 104 (Ill. 1991), which held that tort actions for wrongful discharge are unavailable to in-house counsel. See also, *Herbster v. North American Co.*, 501 N.E.2d 343 (Ill 1986). Once again, plaintiff fails to see the relevance of case authority from other jurisdictions dealing with tort actions for wrongful discharge of a former in-house counsel to a federal RICO claim alleging violations of multiple federal criminal statutes.

Other state Supreme Courts have not adopted Illinois' blanket prohibitions. See *General Dynamics Corp. v. Superior Court*, 876 P.2d 487, 490-91 (Cal 1994) (en banc). In *General Dynamics*, a former in-house counsel filed a contract and tort action alleging that he was terminated in part because he spearheaded an investigation into employee drug use at a company plant and had advised General Dynamics that its salary policy may have been in violation of the Fair Labor Standards Act. In a well-reasoned opinion, the court declined to dismiss the action at the pleadings stage, holding that the in-house attorney may pursue a wrongful discharge claim. Id., 876 P.2d at 495.

Other state courts have also permitted former in-house attorneys to bring wrongful discharge actions in tort. See, e.g., *GTE Products Corp. v. Stewart*, 653 N.E.2d 161, 166-68 (Mass. 1995) (holding that in-house counsel may maintain wrongful discharge action when he was fired for refusing to violate ethical norms); *Parker v. M&T Chemicals, Inc.*, 566 A.2d 215, 220 (N.J. 1989) (holding that employee attorney may bring a damage suit for wrongful discharge under New Jersey's Conscientious Employees Protection Act, as

public policy in favor of whistle-blowing on illegal conduct overrides attorney's ethical duties of confidentiality).

*Doe v. A Corp*, 709 F.2d 1043 (5th Cir. 1983) is Fifth Circuit controlling precedent on the right of an attorney to maintain a suit against his former client or employer when the claim implicates communications protected by the attorney-client privilege. In *Doe*, the Fifth Circuit held that a "lawyer, however, does not forfeit his rights simply because to prove them he must utilize confidential information. Nor does the client gain the right to cheat the lawyer by imparting confidences to him . . . The sole interest [defendant] can assert, other than defeating [plaintiff's] claim, is preservation of confidentiality for the secrets [plaintiff] learned while in its employment . . . There is no compelling interest in allowing a corporation to conceal wrongdoing if in fact any has occurred." *Id.*, 709 F.2d at 1050.

In fact, the federal courts that have been presented with retaliatory discharge actions brought by in-house counsel have generally held that once an attorney's employment has been terminated, he is not barred from bringing suit against the former employer for retaliatory discharge. See, e.g., *Jones v. Flagship International*, 793 F.2d 714, 726 (5th Cir. 1986) *cert. denied*, 479 U.S. 1065 (1987) (in assuming her position as in-house attorney, plaintiff neither abandoned her right to be free from discriminatory practices nor excluded herself from the protections of Title VII); *Verney v. Pennsylvania Turnpike Commission*, 903 F.Supp 826, 832 (M.D. Pa. 1995); *Hoskins v. Droke*, 1995 WL 318817 at *2 (N.D. Ill. 1995); *Kocher v. Acer*, 1993 WL 149077, at *3-4 (N.D. Cal. 1993); *Golightly-Howell v. Oil, Chemical & Atomic Workers International Union*, 806 F. Supp.

21

921, 925 (D.Colo. 1992); see also, *Breckenridge v. Bristol Myers Co.*, 624 F.Supp. 79, 83 (S.D.Ind. 1985).

The federal courts that have addressed the question have cited the important public policies underlying the federal legislation and the supremacy of federal laws in determining that federal laws take precedence over conflicting state law principles. See, e.g., *Jones*, 793 F.2d at 726; *Stinneford v. Spiegel, Inc.*, 845 F.Supp. 1243, 1245-46 (N.D. Ill 1994); *Rod v. CF Industries, Inc.*, 797 F.Supp 643, 645 (N.D. Ill. 1992). In *Breckenridge v. Bristol Myers Co.*, 624 F. Supp. 79 (S.D. Ind. 1985), where the defendant's legal officer claimed that the reasons offered by the company for his dismissal were a pretext for illegal age discrimination, the district court determined that while certain breaches of confidential material were problematic, "what [the plaintiff] did as the defendant's employee is assuredly relevant and pivotal in this case." *Id.*, 624 F. Supp. at 84. The court did not disallow the plaintiff from disclosing confidential information as to his duties and actions as general counsel, and, in fact, explicitly noted that information relating to plaintiff's activities were relevant and discoverable. *Id.*, 624 F. Supp. at 83.

Even if the defendants' concerns about disclosure of client confidences were well-founded, these concerns themselves would not warrant dismissing plaintiff's case, especially in light of the exceptions noted above and where there are other means to prevent unwarranted disclosure of confidential information not covered by the exceptions listed above. Interestingly, in the criminal proceedings against plaintiff which are pending before this court, many of the same alleged confidential communications

complained of by defendants were revealed in plaintiff's filings.   At no time did defendants seek any relief or judicial intervention seeking to stop plaintiff's alleged abuse of client information in connection with those proceedings.   That inaction acknowledges the propriety of plaintiff's disclosure of this information and should act as an estoppel to the relief they seek in this case.

## II. The Complaint states a claim under the RICO Act.

### A. *Plaintiff properly pleads loss causation.*

The RICO Act imposes civil and criminal liability on persons who use or invest income derived from, acquire or maintain control of, or engage in the conduct of an enterprise through a pattern of racketeering, or who conspire to do any of these acts.   18 U.S.C. 1962.   See *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985). "Racketeering activity" is defined to include any of the listed acts, as well as certain federal offenses, usually referred to as predicate acts.   See 18 U.S.C. 1961(1).   *Sedima*, 473 U.S. at 495.

The causal nexus between the alleged predicate acts and the plaintiff's injury must be direct; it is not sufficient that the injury alleged is simply the result of an unlawful act connected to the operation of the alleged RICO enterprise, or in furtherance of its goals. Defendants argue that plaintiff lacks standing to sue under RICO, citing as authority a line of cases which stand for the proposition that a employee may not sue under RICO when the employee has been terminated or discharged for "blowing the whistle" on his employer's racketeering or for the plaintiff's failure to cooperate with that racketeering. See *Cullom v. Hibernia National Bank*, 859 F.2d 1211 (5th Cir. 1988).

Once again, the defendants mischaracterize the nature of plaintiff's claims.  As a threshold matter, plaintiff was neither an employee of the firm nor was he terminated or discharged.  The defendants' attempts to characterize the plaintiff's principal injury as his forced resignation in retaliation for his supposed attempt to blow the whistle on his partners and clients reflects a fundamental misreading of the complaint.  To the extent that the defendants claim that the plaintiff's attempted murder almost two and a half years after plaintiff resigned from the firm alleged in ¶149 of the Complaint is somehow an injury flowing from his discharge (as opposed to directly flowing from the commission of the predicate act), they are seriously misreading the line of cases which they cite.  The same analysis applies to the other five schemes which occurred after plaintiff's departure from the firm.

In *Cullom v. Hibernia National Bank*, 859 F.2d 1211 (5th Cir. 1988), the Fifth Circuit held that an employee discharged for blowing the whistle on his employer's alleged RICO activities could not state a claim because his discharge did not "flow from the commission of the predicate acts."  *Id*. at 1215, quoting *Sedima*, 473 U.S. at 497. Unlike the plaintiff in *Cullom*, the plaintiff in this case was subject to a three year series of unlawful schemes following his departure from the firm, involving predicate acts of bribery, mail fraud, wire fraud, obstruction of justice, obstruction of criminal investigations, witness tampering, and extortion, among others.

In *Cullom*, the Fifth Circuit addressed whether the plaintiff, who alleged he was wrongfully discharged because he refused to participate in a RICO violation, had standing to bring a claim under §1964(c).  In that case, a bank president sued his former

24

employer for violating §1962(c) through engaging in mail and securities fraud, alleging he was asked to resign from his position because he refused to participate and cooperate in the bank's fraudulent scheme. The plaintiff argued that he had stated a cause of action under RICO, by claiming that he was wrongfully discharged for refusing to participate in an activity which was violative of RICO. *Cullom*, 859 F.2d at 1214. The Fifth Circuit disagreed, finding that such a person does not have standing to sue under RICO for his discharge. *Id*. Unlike the plaintiff in this case, the plaintiff in *Cullom* did not allege a series of other predicate acts which directly injured him in his business or property.

In making its determination, the Fifth Circuit in *Cullom* first discussed the proximate causation requirement imposed on the plaintiff under §1964(c). The court explained that a person has standing to sue under §1964(c) only if the alleged racketeering activities forbidden by RICO injure the person in his business or property. *Cullom*, 859 F.2d 1215 (citing *Sedima v. Imrex Co.*, 473 U.S. 479 (1985)). The compensable injury must necessarily flow from the commission of predicate acts that constitute the RICO violation. *Id*. Thus, the court concluded that plaintiff in Cullom did not have standing to bring a RICO claim because he did not allege that he was injured by the predicate acts- securities fraud and mail fraud. *Id*. at 1216. Rather he was injured by defendants' acts of discharging him. "[B]eing discharged for either reporting a RICO violation or refusing to participate in a RICO violation does not flow from the predicate acts; thus, both fail to meet the causal nexus required under the statutory language of §1964(c) and *Sedima*." *Id*. at 1217. A wrongful discharge in and of itself does not constitute a RICO violation and is, therefore, not actionable under RICO. *Id*. Unlike the

plaintiff in Cullom, however, the plaintiff in this case was directly injured by multiple acts of mail and wire fraud, as he was the direct target of the fraudulent representations (to the federal authorities, to disciplinary counsel, to the media, to clients, etc.).

Subsequent to the *Cullom* decision, the Supreme Court also discussed the proximate causation requirement for a claim under §1964(c), specifying that to maintain a RICO suit, a plaintiff must have been directly injured by the actions which violate RICO.  See *Holmes*, 503 U.S. at 274.  In *Holmes*, the Supreme Court held that an alleged stock manipulation scheme that prohibited two broker-dealers from meeting obligations to customers did not proximately cause the injury claimed by a corporation subrogated to the rights of the broker-dealers' non-purchasing customers.  The Court reasoned that the plaintiffs were injured only indirectly by the racketeering activity and, therefore, did not have standing to bring a RICO claim.  *Id*.  The Court explained that the proximate causation requirement is intended to preclude recovery by plaintiffs who complain of injuries from "the misfortunes visited upon a third person" by a defendant's unlawful acts under RICO.  *Id*. at 268.  Here, the misfortunes from the defendant's predicate acts of bribery, mail fraud, wire fraud, obstruction of justice, obstruction of criminal investigations, witness tampering, and extortion were directly visited upon the plaintiff and directly caused injuries to plaintiff consisting of, inter alia, interference with his right to practice law and earn a living, false arrest and false imprisonment resulting in interference with his right to conduct business, interference with his property rights in his partnership interest, interference with his relationships with his current and prospective clients, damage to his business reputation, unlawful withholding of his capital account,

increased insurance costs, and damage to his property interests during the shooting incident.

The Fifth Circuit again addressed the question of standing to bring a RICO claim in relation to an alleged wrongful discharge from employment in *Khurana v. Innovative Health Care Systems*, 130 F.3d 143 (5th Cir. 1997), *vacated sub nom. Teel v. Khurana*, 525 U.S. 979 (1998). The plaintiff in Khurana was a physician who became the medical director of a group that was allegedly engaged in fraudulent Medicaid and Medicare billing practices. After his promotion to medical director, the plaintiff became aware of the fraudulent practices. He was discharged from his position six months later. *Khurana*, 130 F.3d at 146. The plaintiff sued, alleging that the defendants committed a variety of RICO predicate acts, including wire and mail fraud, extortion, bribery and witness tampering. He contended that he was fraudulently induced into "harmful employment associations," which caused him a loss of legitimate business opportunities and damage to his professional reputation. He further claimed that he was wrongfully discharged, causing him a loss in earnings, benefits and reputation, and that the defendants had illegally competed with him in his private practice, causing him a loss of business income. *Id*. at 146-47.

Relying on *Cullom* and *Holmes*, the Fifth Circuit concluded that the plaintiff's discharge and illegal competition claims were too remote to satisfy proximate causation under §1964(c). *Khurana*, 130 F.3d at 149-50. However, as to plaintiff's assertion that the defendants caused him injury by fraudulently inducing him to accept employment via mail and wire fraud, thereby damaging his reputation through association with their

fraudulent activities and depriving him of other legitimate business opportunities, the Fifth Circuit determined that the plaintiff had standing to bring those claims. *Id*. at 150-52. The court ruled that the plaintiff's detrimental reliance on the defendants' misrepresentations as to the legitimacy of the hospital's operations in taking his position with the hospital indicated the necessary proximate causation relationship between the injury and alleged illegal racketeering acts of mail and wire fraud. *Id*. at 150. In other words, the court found that the plaintiff in *Khurana* was directly injured by the defendants' misrepresentations but was not directly injured by the defendants' Medicaid fraud scheme or the defendants' competitive activities following plaintiff's departure from the defendant hospital. Applying this same analysis to the allegations in the plaintiff's complaint, it is clear that the plaintiff's injuries to his business or property were directly caused by predicate acts of bribery, mail fraud, wire fraud, obstruction of justice, obstruction of criminal investigations, witness tampering, and extortion, among others, because plaintiff was the intended target.

The remaining cases cited by the defendants reason that the employee's injury stems from the employer's decision to demote or fire the employee, which they have found only incidentally related to the alleged predicate acts. See *Alden v. Allied Adult & Child Clinic, LLC*, 171 F.Supp.2d 647 (E.D.La. 2001); *Reddy v. Litton Industries, Inc.*, 912 F.2d 291, 296 (9th Cir. 1990), *cert. denied*, 502 U.S. 921 (1991); *O'Malley v. O'Neill*, 887 F.2d 1557, 1561 (11th Cir. 1989), *cert. denied*, 496 U.S. 926 (1990); *Bowman v. Western Auto Supply Co.*, 985 F.2d 383, 388 (8th Cir. 1993); *Nodine v. Textron, Inc.*, 819 F.2d 347, 349 (1st Cir. 1987); *Hamm v. Rhone-Poulenc Rorer Pharms., Inc.,* 187 F.3d

941, 947 (8th Cir. 1999). The defendants do not embrace the substantial authority which distinguishes those cases from the situations where plaintiffs alleged that the conduct constituting the retaliation, harassment or intimidation, which ultimately culminates in the discharge, is itself racketeering. See, e.g., *Dooley v. United Technologies Corp.*, 1992 WL 167053 (D.D.C. June 17, 1992); *Cobbs v. Sheahan*, 385 F.Supp2d 371 (N.D. Ill. 2005); *Mruz v. Caring, Inc.*, 991 F.Supp. 701 (D.N.J. 1998).

Furthermore, the defendants misread the line of precedent they cite. Courts have not held that wrongful terminations are somehow a different kind of injury, rather they have simply held that, under the facts as alleged in those cases, the termination was not the result of a RICO violation. See, e.g., *Kramer v. Bachan Aerospace Corp.*, 912 F.2d 151, 155-56 (6th Cir. 1990) (noting that plaintiff failed to plead facts showing injury from RICO predicate acts). This follows logically from the predicate offense causation requirement announced by the Supreme Court in *Sedima*. It cannot be that those who conduct an enterprise's affairs by engaging in a pattern of racketeering activity directed at an employee (which ultimately causes the employee's termination) can escape liability under RICO. There does not appear to be any case law which carves out one parcel of potential injuries- employment related ones- for treatment substantially different than those injuries to a plaintiff's business or property; the fact that racketeering activity under RICO results in job loss does not transmogrify the racketeering into something else.

Indeed, defendants fail to mention that in the Corporate and Criminal Fraud Accountability Act of 2002, better known as the Sarbanes-Oxley Act, Congress amended the federal criminal code section prohibiting retaliation against witnesses, victims or

informants to prohibit any form of intentional retaliation "including interference with the lawful employment or livelihood of any person."  Section 1107 of the Sarbanes-Oxley Act of 2002 amends 18 U.S.C. §1513 to add the following provision:

> (e)  Whoever knowingly, with intent to retaliate, takes any action harmful to any person, including interference with the lawful employment or livelihood of any person, for providing to a law enforcement officer, any truthful information relating to the commission or possible commission of any federal offense, shall be fined under this title or imprisoned not more than 10 years, or both.

18 U.S.C. 1513(e).  Importantly, because Section 1107 was codified as an amendment to 18 U.S.C. 1513, this prohibition on retaliation, which covers a multitude of employment actions short of actual discharge, makes such activities predicate acts under RICO.  As a result, this amendment to 18 U.S.C. 1513 provides an alternative, additional basis for plaintiff's RICO standing.

In the instant case, plaintiff has pled that his injuries were proximately caused by the racketeering activities of the defendants.  Specifically, plaintiff alleges that the predicate offenses of bribery, mail fraud, wire fraud, obstruction of justice, obstruction of criminal investigations, witness tampering, and extortion, among others, proximately and directly caused the injuries to plaintiff's business and property.  These allegations, together with the factual allegations supporting each predicate offense, are sufficient to establish predicate offense causation for plaintiff's alleged injuries.

For example, plaintiff pleads a violation of 18 U.S.C. 201(b)(3) which provides that whoever:

> directly or indirectly, corruptly gives, offers, or promises anything of value to any person, or offers or promises such person to give anything of value to any other person or entity, with intent to influence the testimony under oath or affirmation of such first-mentioned person as a witness upon a trial, hearing, or other proceeding,

> before any court, any committee of either House or both Houses of Congress, or any agency, commission, or officer authorized by the laws of the United States to hear evidence or take testimony, or with intent to influence such person to absent himself therefrom . . . shall be fined under this title or not more than three times the monetary equivalent of the thing of value, whichever is greater, or imprisoned for not more than fifteen years, or both, and may be disqualified from holding any office of honor, trust or profit under the United States.

18 U.S.C. 201(b)(3).  The factual allegations contained in scheme no. 7 of the Complaint adequately allege a violation of 18 U.S.C. 201(b)(3).

The plaintiff also pleads violations of 18 U.S.C. 1341 (mail fraud) and 18 U.S.C. 1343 (wire fraud) in several schemes in the complaint.  Violations of the federal mail and wire fraud statutes must be pled with particularity pursuant to Federal Rule of Civil Procedure 9(b).  The plaintiff's complaint, when read together with the plaintiff's RICO Case Statement, adequately states the time, place and content of the false representations. Nelson v. Nationwide Mortgage Corp., 758 F.Supp 747, 749 (D.D.C. 1991).  In addition, plaintiff has alleged with specificity use of the mails and wires to execute the scheme. United States v. Perholtz, 842 F.2d 343, 364 (D.C.Cir. 1988).

In addition, the plaintiff pleads violations of 18 U.S.C. 1503 in several schemes in the complaint.  18 U.S.C. 1503 prohibits any corrupt attempt to obstruct the due administration of justice.  The offense requires that the perpetrators intend to obstruct a pending federal court proceeding.  *Pyramid Securities, Ltd. v. IB Resolution, Inc.*, 924 F.2d 1114, 1119 (D.C.Cir. 1991), *cert. denied*, 502 U.S. 822 (1991).  A pending proceeding includes a grand jury proceeding.  *U.S. v. Vesich*, 724 F.2d 451, 454 (5th Cir. 1984); accord, *United States v. Smith*, 729 F.Supp. 1380, 1383-84 (D.D.C. 1990).  The

31

factual allegations contained in schemes 1, 2, 3, 5, 7, and 8 of the plaintiff's complaint clearly describe obstruction of justice schemes.

Furthermore, the plaintiff pleads violations of 18 U.S.C. 1510 in several schemes in the complaint.  18 U.S.C. 1510(a) provides that whoever "willfully endeavors by means of bribery to obstruct, delay, or prevent the communication of information relating to a violation of any criminal statute of the United States by any person to a criminal investigator shall be fined under this title, or imprisoned not more than five years, or both."  The factual allegations in the plaintiff's complaint adequately support violations of 18 U.S.C. 1510.

Similarly, plaintiff claims that the defendants violated 18 U.S.C. 1512, the witness tampering statute, in several schemes set forth in the complaint.  Although the statute does not require a pending proceeding at the time of the offense, it does require some showing that the defendants intended to obstruct some future proceeding or intended to prevent plaintiff from reporting to government officials.  *U.S. v. Gonzales*, 922 F.2d 1044, 1055 (2d Cir. 1991), *cert. denied*, 502 U.S. 1014 (1991).  The factual allegations contained in schemes 1, 2, 3, 5, 7, and 8 of the plaintiff's complaint clearly describe witness tampering schemes directed at the plaintiff.

Moreover, the plaintiff pleads multiple violations of 18 U.S.C. 1513 in several schemes in the complaint.  18 U.S.C. 1513 protects against retaliating against a witness, victim, or an informant.  The factual allegations in the plaintiff's complaint adequately support multiple violations of 18 U.S.C. 1513.

In addition, the plaintiff pleads violations of 18 U.S.C. 1951 in the complaint. The Hobbs Act states in pertinent part that "[W]hoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years or both." 18 U.S.C. 1951(a). The term "extortion" is defined as "the obtaining of property from another, with his consent, induced by the wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. 1951(b)(2). The term "property" for purposes of Hobbs Act liability refers to both tangible and intangible property, including job rights and the right to conduct a business. See, e.g., *National Organization for Women v. Schedler*, 510 U.S. 249, 254 (1994) (finding an injury to business or property under the Hobbs Act where anti-abortion protesters "conspired to use threatened or actual force, violence or fear to induce abortion clinic employees, doctors, and patients to give up their jobs, give up their economic right to practice medicine, and give up their right to obtain medical services at clinics"). Plaintiff's allegations of Hobbs Act extortion set forth in scheme #2 are sufficient to confer standing under 18 U.S.C. 1964(c).

Finally, violation of the Travel Act, 18 U.S.C. 1952, constitutes an enumerated offense under 18 U.S.C. 1961(1). Plaintiff alleges that the defendants violated the Travel Act, by engaging in interstate travel with intent to facilitate violations of 18 U.S.C. 201 (bribery); 18 U.S.C. 1341 (mail fraud); 18 U.S.C. 1343 (wire fraud); 18 U.S.C. 1503

33

(obstruction of justice); 18 U.S.C. 1510 (obstruction of criminal investigations); 18 U.S.C. 1512 (tampering with a witness, victim or an informant); 18 U.S.C. 1513 (retaliating against a witness, victim or an informant); and 18 U.S.C. 1951 (interference with commerce, robbery or extortion).  A violation of the Travel Act is established by showing that a defendant traveled or used a "facility" in interstate or foreign commerce with intent to promote the underlying predicate act violations.  Specific details regarding Travel Act violations will be set forth in the plaintiff's RICO Case Statement.

In summary, the allegations in the complaint, coupled with the additional specificity of the plaintiff's RICO Case Statement, clearly establish direct injury from the predicate acts.  Taken in the light most favorable to the plaintiff, the alleged facts state a cause of action that the injuries were proximately caused by defendants' racketeering activity.

B.  *Plaintiff properly pleads a pattern of racketeering activity.*

The defendants next contend that plaintiff failed to establish that plaintiff's alleged predicate acts of bribery, mail fraud, wire fraud, obstruction of justice, obstruction of criminal investigations, witness tampering, and extortion, among others, amount to a "pattern of racketeering activity."  To prove a "pattern of racketeering activity, plaintiff must prove "at least two acts of racketeering activity . . . the last of which occurred within ten years . . . after the commission of a prior act of racketeering activity."  *U.S. v. Carlock*, 806 F.2d 535, 542 (5th Cir. 1986), *cert. denied*, 480 U.S. 949 (1987).

In *H.J., Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229 (1989), the Supreme Court clarified and narrowed this statutory definition, holding that "to prove a pattern of racketeering activity, a plaintiff . . . must show that the racketeering predicates are related

and that they amount to or pose a threat of continued criminal activity." *Id*. at 239. "It is this factor of continuity plus relationship which combines to produce a pattern." *Id*. Although proof of continuity and relationship may overlap, the two inquiries analytically are distinct prongs of the pattern element requiring separate analysis. *Id*.

The defendants assert that the plaintiff failed to demonstrate that the allegations of predicate acts of bribery, mail fraud, wire fraud, obstruction of justice, obstruction of criminal investigations, witness tampering, and extortion, among others, satisfied either prong of the pattern requirement.    The relatedness inquiry "focuses on the interrelationship of charged RICO predicates," see *U.S. v. Eufrasio*, 935 F.2d 553, 564-65 (3d Cir. 1991), *cert. denied*, 502 U.S. 925 (1991), thereby ensuring that a person is not subjected to RICO sanctions for committing two widely separated and isolated criminal offenses. *Id*. at 565 (citing *H.J., Inc.*, 492 U.S. at 239).

A plaintiff can satisfy the relationship requirement by demonstrating that the alleged predicate acts "have the same or similar purposes, results, participants, victims, or methods of commission or otherwise are interrelated by distinguishing characteristics and are not isolated events. *Calcasieu Marine National Bank v. Grant*, 943 F.2d 1453, 1463 (5th Cir. 1991) (quoting *H.J., Inc.*, 492 U.S. at 240).

Examining the predicate acts alleged by plaintiff within this framework, it is clear that they are sufficiently related to constitute a pattern of racketeering activity.    The purposes of the predicate acts were similar- to silence the plaintiff from providing information to the authorities, to destroy his credibility with regard to his cooperation with the authorities, and to deprive him of the financial resources to fight back.    The

35

predicate acts also had similar results, making it virtually impossible for plaintiff to fight back. The predicate acts involved the same participants- namely, the RICO Defendants named in the complaint. The conduct which the plaintiff seeks to connect into a pattern were directed at the same victim- namely, the plaintiff.

To establish continuity, plaintiff must allege "continuity of racketeering activity, or its threat." *H.J., Inc.*, 492 U.S. at 241. This may be shown by either a closed period of repeated conduct, or an open-ended period of conduct that "by its nature projects into the future with a threat of repetition." *Id*. A closed period of conduct may be demonstrated "by proving a series of related predicates extending over a substantial period of time." *Id*. at 242. An open period of conduct involves the establishment of "a threat of continued racketeering activity." *Id*. This may be shown where there exists a "specific threat of repetition extending indefinitely into the future" or "where it is shown that the predicates are a regular way of conducting defendants' ongoing legitimate business." *Id*. at 242-43. Plaintiff contends that he has pled both a closed period of conduct (the predicate acts occurring and continuing over the last four years) and an open period of conduct (as defendants will continue in their commission of predicate acts until either plaintiff is silenced or the defendants are forced to stop the conduct) as described in *H.J., Inc*.

C. *Plaintiff's RICO Conspiracy Claim (Count 2) is not barred by the intracorporate conspiracy doctrine.*

Plaintiff seeks to recover pursuant to §1962(d) for an alleged RICO conspiracy that was perpetrated by the individual defendants (not the firm). The complaint describes an enterprise separate and distinct from the individual RICO Defendants. The allegations in

the complaint- namely that the individual defendants conspired to conduct the affairs of the enterprise through a pattern of racketeering activity- are completely distinct from a claim not made here that the enterprise conspired with its own employees and agents.

The alleged conduct of individual defendants conspiring among themselves to manage and operate an enterprise, as a matter of law, constitutes a classic RICO conspiracy. Because plaintiff does not even allege that the enterprise (the firm) was part of the conspiracy, the defendants' arguments that a corporation cannot conspire with its employees and therefore cannot form a RICO conspiracy as a matter of law are wholly inapplicable here.

Nonetheless, plaintiff will address defendants' arguments, if only to show that they are advocating a minority view which has no applicability to the instant case. The intracorporate conspiracy doctrine holds that acts of corporate agents are attributable to the corporation itself, thereby negating the multiplicity of actors necessary for the formation of a conspiracy. Simply put, the doctrine states that a corporation cannot conspire with its employees. See *Elliott v. Tilton*, 89 F.3d 260, 265 (5th Cir. 1996); *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1035 (11th Cir. 2000) (en banc).

The Fifth Circuit has never directly addressed the issue as to whether the intracorporate conspiracy doctrine bars §1962(d) claims. The five circuits that have addressed the issue are split on the issue of whether a corporation can conspire with its subsidiaries or with its employees for purposes of a §1962(d) conspiracy claim (once again, a situation not applicable here). The Seventh, Ninth and Eleventh Circuits have held that the intracorporate conspiracy doctrine does not bar §1962(d) claims. See

*Ashland Oil v. Arnett*, 875 F.2d 1271 (7th Cir. 1989); *Webster v. Omnitrition International, Inc.*, 79 F.3d 776, 787 (9th Cir. 1996); *Kirwin v. Price Communications Corp.*, 391 F.3d 1323, 1326 (11th Cir. 2004). The Fourth and Eighth Circuits have reached the opposite conclusion. See *Detrick v. Panalpina, Inc.*, 108 F.3d 529, 544 (4th Cir. 1997); *Fogie v. Thorn Americas, Inc.*, 190 F.3d 889 (8th Cir. 1995). The majority view is that the intracorporate conspiracy doctrine cannot be invoked to defeat a §1962(d) claim. Corporations and their agents are distinct entities and, thus, agents may be held liable for their own conspiratorial actions. See *Cedric Kushner Promotions Ltd. v. King*, 533 U.S. 158, 163 (2001) ("The corporate owner/employee, a natural person, is distinct from the corporation itself, a legally different entity with different rights and responsibilities due to its different legal status").

The complaint describes an enterprise separate and distinct from the individual RICO Defendants who conspired to violate §1962(c). As noted above, because the plaintiff does not allege that the enterprise was part of the conspiracy, the defendants' arguments for dismissal on this basis fail.

**III. The Complaint should not be dismissed based on the doctrine of in pari delicto.**

The defendants assert that the plaintiff's allegations establish an affirmative defense of in pari delicto as a matter of law requiring dismissal of the complaint. While most Rule 12(b)(6) motions are premised on a plaintiff's putative failure to state an actionable claim, such a motion may sometimes be premised on the inevitable success of an affirmative defense. See, e.g., *In re Colonial Mortgage Bankers Corp.*, 324 F.3d 12, 16 (1st Cir. 2003); *Blackstone Realty v. F.D.I.C.*, 244 F.3d 193, 197 (1st Cir. 2001); *Keene*

*Lumber Co. v. Leventhal*, 165 F.2d 815, 820 (1st Cir. 1948). Dismissing a case under Rule 12(b)(6) on the basis of an affirmative defense requires that (i) the facts establishing the defense are definitively ascertainable from the complaint and the other allowable sources of information, and (ii) those facts suffice to establish the affirmative defense with certitude." *Rodi v. S. New England School of Law,* 389 F.3d 5, 12 (1st Cir. 2004).

In pari delicto is both an affirmative defense and an equitable defense. Broadly speaking, the defense prohibits plaintiffs from recovering damages from their own wrongdoing. See Terlecky v. Hurd (In re Dublin Securities), 133 F.3d 377, 380 (6th Cir. 1997). The label derives from the Latin phrase "in pari delicto potior est condition defendatis," which means that where the wrong of both parties is equal, the position of the defendant is stronger. Black's Law Dictionary 791 (6th ed. 1990).

The doctrine is grounded in two premises. The first is that "courts should not lend their good offices to mediating disputes among wrongdoers." *Bateman Eicher, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 306 (1985). The second is that "denying judicial relief to an admitted wrongdoer is an effective means of deterring illegality." *Id*. As originally conceived, the in pari delicto defense forged a defense of limited utility. Over time, however, courts expanded the doctrine's applicability, deploying it as a basis for dismissing suits whenever a plaintiff had played any role- no matter how small- in the harm-producing activity. *Id*., at 307. Deploring this overbroad construction, the Supreme Court later reined in the doctrine and returned it to its classic contours. See *Pinter v. Dahl*, 486 U.S. 622, 635 (1988); *Bateman, Eichler*, 472 U.S. at 310-11.

This retrenchment, which governs the analysis in this case, restricts the application of the in pari delicto doctrine to those situations in which (i) the plaintiff, as compared to the defendant, bears at least substantially equal responsibility for the wrong he seeks to redress and (ii) preclusion of the suit would not interfere with the purposes of the underlying law or otherwise contravene the public interest. *Bateman, Eichler*, 472 U.S. at 311. No fair or tenable reading of the complaint would have plaintiff bearing equal – or anything even approaching substantially equal - responsibility for the unlawful and unethical conduct by his partners set forth in the complaint about which plaintiff objected and reported to authorities. Furthermore, plaintiff asserts that there is a strong public interest in proscribing the racketeering activity set forth in the complaint and the public interest would be served by adjudicating plaintiff's claims in this forum.

## Conclusion

The defendants' attempt to portray client confidentiality as the keystone to the entire legal system fails utterly. Accordingly, inasmuch as the defendants' argument for dismissal depends upon what the defendants present as a near absolute deference afforded client confidentiality, the defendants' motion to dismiss should be denied. Plaintiff has properly demonstrated that a lawyer is permitted to reveal confidential client information to prevent or rectify client crimes/frauds and when the client has made accusations against the lawyer. Plaintiff has noted that many of the clients mentioned in the Complaint have made claims against plaintiff. Furthermore, plaintiff has demonstrated that clients are not allowed to invoke attorney-client confidentiality in order to deny a lawyer the means of self-defense to claims made about the lawyer. In addition, plaintiff

has shown that client confidentiality cannot be used to deny a lawyer means of obtaining his rights. Plaintiff has also shown that the firm stand in the shoes of the clients, where the firm has taken an assignment of the clients' claims. There is no basis or justification for subverting plaintiff's rights to client confidentiality.

The defendants claim that the Complaint fails to state a claim under RICO for lack of causation and pattern. In order to give their claim even the faintest hint of plausibility, the defendants attempt to mislead the court by misrepresenting plaintiff's complaint as that of nothing but a whistleblower who thinks he was wrongly dismissed from his job. In order to effect this whistleblower veneer, the defendants have to – and conveniently do – overlook the predicate acts set forth at the beginning of each scheme laid out in the Complaint. The fact that the Complaint puts forth a series of predicate acts to which the plaintiff was subject for three years after he left the firm is sufficient to demonstrate the emptiness of defendants' misleading mere whistleblower depiction. This also establishes that the plaintiff was directly injured in his business or property by the defendants' predicate acts. Furthermore, the Complaint refers to appropriately earlier predicate acts similarly directed against plaintiff; therefore, plaintiff has shown the requisite continuity and pattern. The defendants also mischaracterize the Complaint by asserting that it fails in accord with the intracorporate conspiracy doctrine; however, the fact is that the conspiracy revealed in the Complaint is between individual defendants and not between the firm and its officers. Based on the foregoing, the defendants' motion for dismissal should be denied.

Finally the defendants assert that the affirmative defense of *in pari delicto* requires dismissal of the Complaint. Unfortunately for the defendants, their argument amounts to nothing more than the long ago discredited notion that anyone who has any involvement whatsoever in harm-producing activity has dirty hands and is not to be allowed to proceed with claims against others who were primarily involved. An *in pari delicto* defense is currently restricted to instances in which the plaintiff has at least substantially equal responsibility for the wrong at issue, and that is clearly not the case with this Complaint. Accordingly, the defendants' motion for dismissal based on the affirmative defense of *in pari delicto* should be denied.

For all of the foregoing reasons, the defendants' motion to dismiss should be denied.

Respectfully submitted,


*/s/ Robert H. Matthews*
Robert H. Matthews, BAR #9055
830 Union Street, 4th Floor
New Orleans, LA 70112
telephone: (504) 523-4542
fax: (504) 523-6139
e-mail: mattbo52@aol.com



*/s/ Pauline M. Warriner*
Pauline M. Warriner, Bar #22673
830 Union Street, 4th Floor
New Orleans, LA 70112
telephone: (504) 523-4542
fax: (504) 523-6139
e-mail: mattbo52@aol.com

## CERTIFICATE OF SERVICE
_____

I hereby certify that a copy of the above and foregoing pleading has been filed electronically with the United States District Court for the Eastern District of Louisiana, Clerk of Court by using the CM/ECF system which will send a notice electronic filing to all counsel of record on this 24th day of June, 2008.


*/s/ Robert H. Matthews*